UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                                               **Hon. Hugh B. Scott**

                  v.                                    07CR29S

                                                                **Report**
                                                                 &amp;
Colin Greenaway                                          **Recommendation**
also known as Wayne Smart,

                                            Defendant.
_____


Before the Court is the defendant's omnibus motions seeking various relief, including the suppression of evidence (Docket Nos. 26 and 39). The omnibus motions seeks disclosure of exculpatory material, the identity of informants, Rule 404(b) information, Rule 16 discovery, Rule 12 notice, disclosure of Jencks Act material, a bill of particulars, disclosure of information from personnel files, preservation of evidence, disclosure of Rule 807 material, an audibility hearing, and suppression of evidence (Docket No. 26).[1] A second motion was filed also seeking suppression of evidence (Docket No. 39).[2]

---

[1] The discovery issues will be the subject of a separate Decision & Order.

[2] This motion is duplicative of the suppression requests filed in the omnibus motion but includes an affidavit in support filed by the defendant.

1

**Background**

In an indictment issued on February 1, 2007, defendant Colin Greenaway also known as Wayne Smart (referred to herein as "Smart"), was charged with conspiracy to possess and distribute methylenedioxymethamphetamine ("MDMA") in violation of 21 U.S.C. §841(a)(1) and (b)(1)(C) [Count I]; carrying and brandishing a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. §924(c)(1)(A)(ii) and (2) [Count 4]; and destruction of property (marijuana) preventing and impairing the government from taking such property into its custody and control in violation of 18 U.S.C. §2232(a) [Count 7].

The defendant seeks to suppress certain statements and evidence. A suppression hearing was held on January 16, 2008, March 31, 2008, and April 17, 2008. It appears that on January 11, 2007, Christopher Wisneiwski, a Special Agent with the United States Drug Enforcement Administration ("DEA") received a tip from the Department of Homeland Security advising that an individual who identified himself as "Colin Greenaway"[3] was staying in Room 307 at the Comfort Inn Suites in Buffalo and that there was a large quantity of crack cocaine and a large sum of money in his room. (R. 5). Wisneiwski testified that the hotel management advised him that the housekeeping staff reported seeing a large quantity of crack and a large amount of money in the room (R. 9).[4] Wisneiwski was allowed to review the maintenance and housekeeping

---

[3] A Canadian drivers license for an individual named "Colin Roley Greenaway" was subsequently from the hotel room. The government contends that Smart used this identification to rent the hotel room. (R. 54, 61, 162). For the purposes of the suppression hearing, Smart stipulated to these facts. (R. 204).

[4] According to Wisneiwski, he did not meet with the housekeeping staff member in person (she had already gone home that day)(R. 59), however, the information given to him led

reports relating to the room occupied by Smart. One notation dated January 10, 2007 stated that a "strong odor of pot" was coming out of Room 307. (R. 8).

Wisneiwski, and another DEA agent, Christian Ulmer, established surveillance in Room 308 across the hall from Room 307. (R. 11). Ulmer testified that he could detect the odor of marihjuana emanating from the room. (R. 80, 143). They observed three individuals in addition to Smart coming in and out of Room 307 who were later identified as Eloise Thomas, Andre Bennett and Camara Griffin. (R. 11). At one point two of the individuals left the room, got into a rental car and left. The two individuals subsequently returned to Room 307. (R. 12-13).[5] At one point Ulmer, found himself in the hallway just as some of the individuals in Room 307 had proceeded down the hallway to the elevator. Smart then came out in the hallway to call after those individuals. Ulmer told Smart that "his friends" had gotten on the elevator. Ulmer and Smart entered into a conversation. Ulmer asked Smart if he had a blunt. Smart asked Ulmer if he wanted a blunt or a blunt wrapper. Ulmer replied: "blunt wrapper." At which point, Smart allegedly gave Ulmer a cigar. (R. 13-14; 146-147). Collaborating with the other agents, Wisneiwski formulated a plan in which they would have agents approach Thomas and Bennett, who had again left the hotel and were heading toward a vehicle in the parking lot. The officers identified themselves as police and asked Thomas and Bennett[6] to cooperate with them and take

---

him to believe that the housekeeper may have had some previous exposure or experience with crack cocaine or cocaine or other drugs. (R. 10, 65).

    [5] It was subsequently determined that the two went to a liquor store and then returned to the room (R. 85)

    [6] At the time the agents approached Bennett, they did not know whether or not he was "Greenaway" (the person under whose name the room was rented). (R. 130).

them back up to Room 307. (R. 14-15). Thomas and Bennett refused to cooperate and even denied having come out of Room 307. (R. 16-17).

Having disclosed the existence of the investigation to Thomas and Bennett, the agents determined that the two could not be allowed to communicate with Smart and whoever else remained in the room. The agents also reasoned that Smart would become suspicious and their investigation would be compromised if Thomas and Bennett *did not* return to the room. (R. 181-185). The agents formulated a new plan, in which Ulmer, who had already had some interaction with Smart, would approach the door of Room 307, knock on the door and see if Smart would open the door and cooperate. (R. 18, 148). As Ulmer approached the door, Wisneiwski and another officer were hiding nearby; they could see and hear Ulmer, but could not fully observe the doorway. (R. 19). After Ulmer knocked on the door, Smart eventually answered and opened the door. Ulmer asked Smart for another blunt wrapper. (R. 101). Wisneiwski testified that Smart stated that he did not have another blunt and was "kind of short" with Ulmer. (R. 20). When Smart attempted to close the door, Ulmer announced himself as a law enforcement officer and put his foot in the door to prevent it from closing. (R. 21, 151). Wisneiwski moved in to assist Ulmer. As the pushing and shoving of the door ensued, an arm holding a black semi-automatic pistol was extended out of the door by someone inside the room. (R. 22-23, 152).[7] Both officers testified that they heard a "click" indicating that an attempt to fire the weapon was made. (R. 23, 152). At this point he and Ulmer jumped out of the way, and the door closed. (R. 23-24). After evacuating adjacent rooms, Wisneiwski attempted to start a conversation with the individuals

---

[7] It was subsequently determined that the person who had pointed the gun at the agents was Griffin, not Smart. (R. 111, 160).

4

inside the room. According to Wisneiwski, for approximately two minutes they heard "a lot of commotion in the room" and he thought that they were flushing drugs down the toilet or trying to plan an escape route. (R. 25-26). Wisniewski testified that after a few minutes "a person with a Jamaican accent" spoke back and indicated that they were going to surrender. (R. 25). Eventually, the door was opened, the gun was recovered and Smart and Griffin were arrested. (R. 29). Ulmer testified that he read the Miranda[8] warnings to Smart within a few minutes before being removed from the room and that he acknowledge that he understood his rights. (R. 117, 156). According to Ulmer, Smart stated that all they did was "flush a little bit of marijuana." (R. 156-157). A full search of the hotel room was conducted. (R. 134).

Wisneiwski testified that a search of the hotel room revealed a loose round found on the bedroom floor (R. 41). A baggie and little plastic vials with plastic caps having marijuana residue in them were found near the toilet on the vanity. (R. 42, 52; and Government's Exhibit 5). He testified that based on his experience as a DEA agent, "marijuana users or dealers typically store or sell marijuana in bags or containers like this." (R. 42). Wisneiwski stated that several cellular phones, some receipts, notes with phone numbers and a "marijuana blunt wrapper" were also found. (R. 43 and Government Exhibits 6-9). According to Wisneiwski, the items were discovered in plain view. An unidentified red tablet was also found (R. 43).[9] A substance

---

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

[9] It appears that a marijuana cigarette and over 100 ecstasy tablets were recovered as a result of a pat down of Thomas while in the parking lot. (R. 38). Subsequently, according to Wisniewski, Griffin advised the agents that he came from Atlanta to pick up a large amount of ecstasy that was supposed to be delivered from Canada and that Smart had coordinated the shipment. (R. 39). Griffin also advised the government that he thought the person pushing in the door was going to try to come in and rob him. (R. 124).

thought to be crack was also recovered, however, laboratory results determined that the substance was not crack cocaine. (R. 53).

It is undisputed that the law enforcement agents did not have a search warrant permitting them to enter or search Room 307 or any of the individuals in that room.[10] Wisneiwski and Ulmer testified that they did not rule out applying for a search warrant, but that they wanted to attempt to get consent to enter the room first. (R. 95, 167).

**Discussion**

The defendant argues that the agents illegally entered Room 307 when Ulmer prevented Smart from closing the door to the room. (Docket No. 26 at page 22). Smart argues that the agents lacked probable cause to enter the room and that exigent circumstances did not exist to justify the entry. (Docket No. 80 at page 17-19). The government contends that probable cause existed to believe that Smart was engaged in drug trafficking and that once Ulmer identified himself as a law enforcement officer, the defendant was attempting to destroy evidence. (Docket No. 81 at page 11). Further, the government asserts that even if it were found that Ulmer's attempt to enter the room was impermissible, the fact that someone in the room stuck out a gun and attempted to fire at the officers constituted a "new" crime, justifying the entry of the room and the subsequent arrests. (Docket No. 81 at page 13-14).

The Fourth Amendment protects individuals against unreasonable searches and seizures. *See* U.S. Const. amend. IV. To be reasonable under the Fourth Amendment, a search of a home

---

[10] Wisneiwski testified that the agents wanted to conduct additional surveillance to bolster any probable cause they may have had before applying for a search warrant. (R. 69).

must either be conducted pursuant to a warrant or meet an exception to the warrant requirement. See Kyllo v. United States, 533 U.S. 27, 31 (2001). Among the recognized exceptions to the warrant requirement is the presence of exigent circumstances:

> The warrant requirement of the Fourth Amendment guarantees the fundamental right to be free from government intrusion into the privacy of one's home. It is well-settled, however, that the warrant requirement must yield in those situations where exigent circumstances demand that law enforcement agents act without delay... . The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an "urgent need" to render aid or take action.

United States v. MacDonald, 916 F.2d 766, 769 (2d Cir.1990) ( *in banc* ) (citations omitted) (quoting Dorman v. United States, 435 F.2d 385, 391 (D.C.Cir.1970) ( *in banc* )). The Second Circuit has identified the following factors as guides to determine whether exigent circumstances justifying a warrantless entry are present:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

Loria v. Gorman, 306 F.3d 1271, 1284 (2d. Cir. 2002)(citations omitted). These factors are "intended not as an exhaustive canon, but as an illustrative sampling of the kinds of facts to be taken into account." MacDonald, 916 F.2d at 770. Thus, the presence or absence of any single factor is not dispositive. Ultimately, "[t]he essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by

an 'urgent need' to render aid or take action." Id. at 769 (quoting Dorman, 435 F.2d at 391. In answering that question, the Court is cognizant of the Supreme Court's admonition that "exceptions to the warrant requirement are few in number and carefully delineated and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984) (citation omitted). The presence of a solitary factor may suffice to support the finding of exigent circumstances. United States v. Gallo-Roman, 816 F.2d. 76, 79080 (2d. Cir. 1987).

A review of the totality of the evidence reflects that probable cause existed to believe that Smart was engaged in drug trafficking. Wisniewski and Ulmer had been advised of reports from the hotel housekeeping staff that the odor of marijuana had been detected emanating from the room; one housekeeper reported seeing crack cocaine and a large sum of money; the agents themselves detected the odor of marijuana emanating from the room; Ulmer asked for and obtained a "blunt wrapper" from Smart; Thomas and Bennett, when approached in the parking lot, did not respond to questions accurately given the information already possessed by the officers. Although these facts would support the issuance of a search warrant, they do not, by themselves, demonstrate the existence of exigent circumstances justifying the warrantless entry into the room. While the distribution of narcotics may be considered a grave offense, the officers in question were acting on limited information. While the information they had may have been sufficient to establish probable cause for a warrant, it was insufficient to establish a threat that evidence would be destroyed or that the safety of the officers or other individuals was at stake. At the time Ulmer stuck his foot into the door to prevent it from closing and identified himself as a police officer, he did not know what, if any drugs, remained in the room; he did not know if the individuals in the

room possessed weapons. Information that illegal drugs may be in the room is insufficient by itself to establish exigent circumstances (if it were sufficient, police would have no need to obtain search warrants in most drug cases). Although Ulmer was concerned that the absence of Thomas and Bennett might make Smart suspicious, he did not know how soon Thomas and Bennett were expected back. No evidence was presented at the suppression hearing upon which it could be concluded that Smart was aware that Ulmer was a law enforcement officer prior to his announcing himself as such. The government has not demonstrated a reasonable basis to conclude that any drugs in the room would have been destroyed absent an immediate warrantless entry into the room by Ulmer and the other agents.

Notwithstanding what may be characterized as an impermissible attempt to enter the room by Ulmer, once a gun was brandished and attempts to shoot at the agents were made, a new, distinct crime had been committed creating exigent circumstances and justifying the entry into the room. United States v. Bailey, 691 F.2d 1009, 1017 (11th Cir. 1982); see United States v. Hunt, 372 F.3d 1010, 1012 (8th Cir. 2004) ("When a defendant commits a new and distinct crime during an unlawful detention, the Fourth Amendment's exclusionary rule does not bar evidence of the new crime."). United States v. Mattiex, 2006 WL 2741645 (S.D.N.Y.,2006)( quoting Bailey, 691 F.2d at 1017: "A contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct."). See also United States v. King, 724 F.2d 253, 255-56 (1st Cir. 1984) (finding that even if the defendant was illegally detained at the rest stop, when his companion began firing a gun, police had probable cause to search defendant because the shooting was independent intervening act which purged taint of prior illegality).

9

The defendant also argues that the agents "created" the exigent circumstances by their actions. The evidence adduced at the hearing reflects that Ulmer identified himself as a police officer as soon as he placed his foot in the door. It was subsequent to this announcement, as the respective parties pushed and shoved the door, that the gun was brandished and the attempted shooting took place. This conduct by one of the occupants of the room was not forced by Ulmer. Smart argues that he and Griffin did not believe that Ulmer was a police officer. (Docket No. 80 at page 19). The fact that Smart and/or Griffin assert that they did not believe Ulmer was a police officer does not impact the determination that the officers had reasonable cause to believe that a crime (the brandishing of the gun and the attempted shooting) had been committed in their presence justifying the entry into the room. The defendant has presented no authority suggesting that once an officer announces that he is a police officer; it is not a crime for a suspect to brandish a gun and attempt to shoot at the officer because he did not "believe" the individual was a police officer. See People v. Matthews, 25 Cal. App.4th 89, 96 (1994) (violation of knock-and announce rule does not render all evidence of subsequent crime — pointing gun at police officer — inadmissible; to do so "would stretch the exclusionary rule beyond the bounds of common sense and public policy"); People v. Townes, 359 N.E.2d 402 (N.Y. 1976)(refusing to suppress the firearm because the defendant's "free and independent action in pulling and attempting to fire the gun, taken after and in spite of, or perhaps because of, the plain clothesman's identification of himself as a police officer, serves to render any 'connection between the lawless conduct of the police and the discovery' [of the gun] "so attenuated as to dissipate the taint"'" [citations omitted]). In any event, because Ulmer and Wisniewski possessed a reasonable basis to believe that a crime had been committed, the arrest for the crime is lawful and evidence seized in a search

incident to that lawful arrest is admissible. Bailey, 691 F.2d at 1018.

The defendant also argues that the post-arrest search of the room was impermissible. Clearly, under the circumstances of this case, once the officers legally gained entry into the room they were permitted to make a protective sweep of the suite[11] to determine whether any other persons or weapons were present. The defendant's reliance upon United States v. Vargas, 376 F.3d. 112 (2d. Cir. 2004) is misplaced. In that case, DEA agents responding to a tip knocked on Vargas' hotel room door. Vargas answered the door, agreed to talk with the agents and invited them into the room. the agents did not pat down Vargas to check for weapons and an interview was conducted in a friendly manner. Because the officers became suspicious when Vargas closed the bathroom door, another DEA officer opened the door and discovered evidence of heroin. 376 F.3d. at 113-114. Missing from Vargas was any evidence of a threat to the officers. In the instant case, a gun had been brandished and an attempt to shoot at the officers had been made. Further, although surveillance had indicated that at least four individuals had been coming and going from the room, the agents did not have solid information as to how may individuals were inside the room. (R. 177). Under these circumstances, it was reasonable to conduct a protective sweep of the hotel suite. Further, Wisneiwski testified that all of the evidence collected from the hotel suite in this case was found in plain view. (R. 43). The Court finds this testimony credible. "[U]nder the 'plain view' doctrine, law enforcement personnel may seize an item without a warrant provided that it is'immediately apparent that the object is connected with criminal activity,' and further provided that the officers viewed the object from a lawful vantage point–i.e.,

---

[11] Testimony reflects that the suite consisted of a sitting room, a bedroom and a bathroom. (R. 28, 43, 122)

11

that the officers 'have not violated the Fourth Amendment in arriving at the place from where they can see' the object." United States v. 557,933.89 More or Less, in U.S. Funds, 287 F.3d 66, 81 (2d Cir. 2002). Under this doctrine, in order to lawfully seize an item, all that is required is that the law enforcement officer "ha[ve] probable cause to suspect that the item is connected with criminal activity." United States v. Martin, 157 F.3d 46, 54 (2d Cir. 1998) (internal quotation marks omitted). As described above, the testimony of Wisniewski and Ulmer is sufficient to establish that probable cause existed to believe that the items seized from the hotel suite (including a weapon, ammunition, baggies, plastic vials containing marijuana residue, cell phones, receipts, documents with names and phone numbers, and the Canadian drivers license) were connected with criminal activity.

In light of the above, the motion to suppress the physical evidence should be denied.

Smart also argues that any statements he made should be suppressed based upon the fact that the DEA agents testifying at the suppression hearing were not asked to state the explicit language used when Ulmer read the Miranda warnings to Smart. (Docket No. 80 at page 24). Ulmer testified that he read the Miranda warnings to Smart from a card taken from his wallet. (R. 156, 176, 180, 192). On cross-examination, the following testimony was elicited from Ulmer:

> Q. You testified that after entering the room and after Mr. Smart was placed in custody, that you gave him these Miranda warnings; is that correct?
> A. That's correct.
> Q. And you gave them, what, one after the other, the various warnings?
> A. Whenever I read my Miranda warnings, I take it out of my wallet and I read it verbatim.

(R. 192).

The defendant relies upon United States v. Lamia, 429 F.2d 373, 376-77 (2d Cir. 1970) and United States v. Burns, 684 F.2d. 1066, 1074-75 (2d. Cir. 1982). Although these cases discuss what warnings are required to be given, they do not hold that it is necessary at a suppression hearing to elicit the express testimony as to the specific language used in providing the Miranda warnings.

The government "bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of [the] Miranda doctrine, [but] need prove waiver only by a preponderance of the evidence." Colorado v. Connelly, 479 U.S. 157, 168 (1986). There are cases in which courts have held that the government failed to meet its burden of proving that adequate Miranda warnings were given where the arresting officer failed to testify concerning the specific content of the warnings. See Moll v. United States, 413 F.2d 1233, 1238 (5th Cir.1969) ("The government's burden may not be met by presumptions or inferences that when police officers read to an accused from a card they are reading Miranda warnings or that what is read, without revelation of its contents, meets constitutional standards."); United States v. Gilmer, 793 F.Supp. 1545, 1555 (D.Colo.1992) ("[O]nly with specific testimony can the court decide whether the officers conveyed all of the proper warnings...."); Ex parte Price, 725 So.2d 1063 (Ala.1998) ("In the absence of any evidence indicating the contents of the form that was read to Price or explaining [the arresting officer's] understanding of what rights must be explained to a suspect, we are forced to conclude that there was no evidence from which the court could have properly concluded that Price was advised of each of the rights established in *Miranda* ....").

Other courts have held that the lack of such express testimony does not necessarily require suppression. In United States v. Muniz, 93 Fed.Appx. 208 (10th Cir. 2004), the court declined to

establish a bright line rule requiring suppression where there was a lack of specific testimony at the suppression hearing as to the language used to provide the defendant his rights. In Muniz, the court held:

> Under the circumstances ... the district court's finding that the Miranda warnings were read was not clearly erroneous based on the evidence before it. The arresting officer testified at the suppression hearing that he read Mr. Rojas-Muniz his rights from a "Miranda card," which had the Miranda warnings written in English on one side and in Spanish on the other. ... Although the card was not admitted into evidence, the officer produced it on the stand, and it was examined at that time by Mr. Rojas-Muniz's attorney. ... The fact that neither the government nor Mr. Rojas-Muniz's attorney asked the officer to read the warnings printed on the card or otherwise explain the content of the warnings given indicates to us that the primary dispute here was not over the content of the warnings but over whether any warnings had been given at all. While Mr. Rojas-Muniz denied that he had been read any warnings, the district court credited the arresting officer's version of events rather than Mr. Rojas-Muniz's. The court did not clearly err in doing so or in drawing the reasonable inference, in the absence of any allegation to the contrary, and in light of its finding that the officer read the warnings from a pre-printed Miranda card, that the warnings given were indeed the standard Miranda warnings.

Muniz, 93 Fed.Appx. at 210-211. In United States v. Klein, 592 F.2d 909, 914 (5th Cir.1979), the court similarly declining to require specific testimony of warnings' content where the defendant admitted warnings were given and arresting officer testified he read from a card containing "the standard Miranda warnings". Similarly, in United States v. Magana, 2007 WL 680784 (D.Nev. 2007), the court held:

> Although a mere reference to reading Miranda rights is not sufficient evidence, an arresting officer's testimony that he read the Miranda warnings from a Miranda card has been deemed sufficient evidence. U.S. v. Muniz, 93 Fed. Appx. 208 (10th Cir.2004). In the

14

> present case, Officer Prunchak testified that he read the defendant
> his Miranda warnings from a card that he carries in his pocket. ...
> Further, Officer Prunchak's arrest report states that he read the
> Miranda warnings to the defendant from a preprinted card. ...
> Thus, the Government has established that the defendant was
> advised, and was therefore aware of his Miranda rights.

Magana, 2007 WL 680784 at *6. It is not apparent from the Muniz-Klein-Magana cases as to how there was corroboration of the substance of the rights provided to the respective defendant, without introduction of the rights card or testimony of the content of the rights provided.

In any event, in the instant case, although Ulmer testified that he read the Miranda rights to Smart from a card that he keeps in his wallet, he did not testify as to the specific language or content of the warnings on the card, he did not produce the card, and none of the exhibits moved into evidence by the government corroborate the fact that Ulmer read the warnings to Smart.[12] The facts in this case are more analogous to those set forth in Moll and Gilmer. Here, the defendant *does* challenge the sufficiency of the rights provided. In his motion to suppress, Smart asserts that "if any rights were read or administered to defendant Smart, such rights were insufficient in and of themselves, and therefore, any custodial questioning of defendant Smart was illegal." Docket No. 26 at page 27. Based upon the record in this case, the Court cannot conclude that the government has satisfied its burden to establish by a preponderance of the evidence that adequate Miranda warnings were administered to Smart prior to his making the statement to the effect that "all he did was flush a little marijuana." There does not appear to be a dispute that this was a custodial statement. This statement should be suppressed.

---

[12] The government moved Exhibits 1 through 14 into evidence. (R. 133). Although another document designated Government's Exhibit 3501 was marked for identification (R. 48-49), it does not appear that this document was moved or admitted into evidence.

**Conclusion**

Based on the above, it is recommended that the motion to suppress the physical evidence obtained from Room 307 should be denied, but that the motion to suppress the custodial statement made by Smart should be granted.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v.

Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.

*/s/ Hugh B. Scott*
United States Magistrate Judge
Western District of New York

Buffalo, New York
October 22, 2008